<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| KEVIN H. ADAMS,<br><br>     Plaintiff,<br><br>  v.<br><br>CAPACITY, LLC *et al.*,<br><br>     Defendants. | Civil Action No. 23-23265 (GC) (JTQ)<br><br>     <u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

  **THIS MATTER** comes before the Court upon Defendants Capacity LLC and Jeffrey Kaiden's Motion for Summary Judgment (ECF No. 33) and Plaintiff Kevin H. Adams' Motion for Partial Summary Judgment (ECF No. 34). Defendants seek dismissal with prejudice on all counts of Plaintiff's Complaint (ECF No. 33) and Plaintiff seeks partial summary judgment as to Plaintiff's breach of contract claim (ECF No. 34). Both parties opposed the other's Motion (ECF Nos. 38, 39) and replied (ECF Nos. 40, 41). The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' Motion is **GRANTED in part** and **DENIED in part** and Plaintiff's Motion is **DENIED**.

## I.   BACKGROUND

### A.   Factual Background[1]

In May 2021, Plaintiff, a Black man, was hired as the Chief Operating Officer (COO) of Capacity, LLC.  (ECF No. 33-1 ¶¶ 1, 4; ECF No. 34-1 ¶ 1.)[2]  Capacity, LLC is "a third-party logistic[s] company in New Jersey that specializes in fulfillment services for companies."  (ECF No. 33-1 ¶ 2; ECF No. 38-1 ¶ 2.)  Capacity's customers are consumer brands.  Those brands send Capacity their products and Capacity stores those products as inventory.  (ECF No. 38-7 at 10:17-24.)[3]  When consumers order from a brand, that brand transmits the order to Capacity, who fulfills the order from its inventory and ships product to the consumers.  (*Id.*)  Capacity is an at-will employer and its stated policy is to "maintain[] a work environment that is free of discrimination and any forms of harassment[] and represents a professional atmosphere."  (ECF No. 33-1 ¶¶ 11-13; ECF No. 38-1 ¶¶ 11-13.)  Jeffrey Kaiden is Capacity's Chief Executive Officer (CEO).  (ECF No. 33-1 ¶ 3; ECF No. 38-1 ¶ 3.)

---

[1]   On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party."  *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).  The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1.  Defendants' Statement of Undisputed Material Facts is at ECF No. 33-1 and Plaintiff's Responsive Statement of Material Facts and "Additional Facts Precluding Summary Judgment to Defendants" are at ECF No. 38-1.  Plaintiff's Statement of Undisputed Facts is at ECF No. 34-1, Defendants' Response to Plaintiff's Statement of Undisputed Material Facts is at ECF No. 39-2, and Defendants' Statement of Disputed Material Facts is at ECF No. 39-1.  Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

[2]   Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[3]   Page and line numbers for transcript citations refer to the internal page numbers stamped by the Court Reporter rather than the page numbers stamped by the Court's e-filing system.

### 1.    *Employment Agreement*

Plaintiff and Capacity entered an Employment Agreement (the Agreement) that set forth the terms of Plaintiff's employment and termination.  (ECF No. 34-1 ¶ 2; ECF No. 39-2 ¶ 2.)  The Agreement is for a term of five years.  (ECF No. 33-1 ¶ 4; ECF No. 34-1 ¶ 3.)  The Agreement provides that "[Plaintiff] shall perform such duties as are generally associated with the position of 'Chief Operating Officer' of a company of similar size as Capacity.  [Plaintiff's] duties may be reasonably modified at Capacity's discretion from time to time."  (ECF No. 33-6 at 2.)

As to compensation, the Agreement specifies that Plaintiff's base salary is $305,000, with a signing bonus of $75,000 and a guaranteed "financial incentive bonus" of not less than $115,000 yearly.  (ECF No. 33-1 ¶ 6; ECF No. 34-1 ¶ 4; ECF No. 38-1 ¶ 6; ECF No. 33-6 at 2-3.)  The Agreement also includes a provision for a "sale incentive bonus" where "[i]f, while [Plaintiff] is employed by Capacity, some or all of Capacity is sold, whether by a sale of Capacity equity interests or by a sale of Capacity assets, [Plaintiff] shall receive a bonus equal to a percentage of the purchase consideration."  (ECF No. 33-6; *see also* ECF No. 33-1 ¶ 7; ECF No. 38-1 ¶ 7.)  If that sale of Capacity led the company to a valuation of between $100 and $150 million, Plaintiff would receive 1% of the purchase consideration and if the sale led to a valuation of over $150 million, Plaintiff would receive 1.5% of the purchase consideration.  (ECF No. 33-6 at 3.)

The Agreement also provides three categories for termination: "By Executive for Good Reason,"[4] "By Capacity Without Cause," and "By Capacity for Cause."  (ECF No. 34-1 ¶ 5; ECF No. 33-6 at 7-8.)  Termination "By Capacity Without Cause" specifies that:

> Capacity may terminate this Agreement without Cause (as defined below) upon ninety (90) days' written notice to [Plaintiff] . . . If Capacity terminates the employment without Cause, then, provided

---

[4]    This provision allows Plaintiff to terminate the Agreement for "Good Reason," defined within the Agreement, upon 60 days' notice.  (ECF No. 33-6 at 7.)  This provision is not at issue.

> that [Plaintiff] has executed a release agreement in a form acceptable
> to Capacity and has otherwise complied with all of his obligations
> under this Agreement, [Plaintiff] shall receive severance equal to his
> Base Salary for a period of twelve (12) months.

(ECF No. 34-1 ¶ 6.)  Termination "By Capacity for Cause" allows Capacity to terminate the

Agreement without notice, and defines "Cause" as:

> (1) [Plaintiff's] material breach of this Agreement which remains
> uncured after the lapse of thirty (30) days following the date that
> Capacity has given [Plaintiff] written notice of the Cause grounds;
> (2) [Plaintiff's] indictment for any felony or any other crime
> involving dishonesty, fraud, embezzlement or moral turpitude; or (3)
> [Plaintiff's] commission of a material act of theft, dishonesty, fraud,
> or embezzlement of any goods or property of Capacity or any
> affiliate of Capacity.

(*Id.* ¶¶ 7-8.)

### 2.      *Plaintiff's Employment at Capacity*

After Plaintiff began his employment in the spring of 2021, he was considered an

"'outstanding performer' who was 'well liked by his team and colleagues.'" (ECF No. 33-1 ¶ 5;

*see also* ECF No. 34-1 ¶ 16.)  The parties agree that Plaintiff's job responsibilities included:

"[a]cting as a strategic business partner to the CEO and providing 'inspirational leadership and

strategic direction to Capacity's operations;' [e]nsuring a 'safe and secure working environment at

each facility;' and [e]stablishing and maintaining 'positive employee relations and excellent

internal communications.'"[5]  (ECF No. 33-1 ¶ 10; ECF No. 38-1 ¶ 10.)  Plaintiff was the only

---

[5]      These job responsibilities were not enumerated in the Agreement (ECF No. 33-6) but are
set forth in the "Position and Candidate Specification" used by an executive search firm in
identifying COO candidates.  (*See* ECF No. 33-2 at 15; ECF No. 33-7 (Position and Candidate
Specification).)  The document also lists many "key responsibilities," "leadership capabilities,"
and desired personal characteristics.  (*See* ECF No. 33-7 at 4-7.)  The Agreement makes no
reference to the "Position and Candidate Specification," either explicitly or implicitly.  Instead,
the Agreement only describes Plaintiff's duties as those "generally associated" with the COO
position "of a company of similar size as Capacity."  (ECF No. 33-6 at 2.)

4

Black person on the executive team.  (ECF No. 38-7 at 13:12-14.)  Plaintiff was never placed on a performance improvement plan, nor did he receive any written discipline during his employment.  (ECF No. 34-1 ¶ 17; ECF No. 39-2 ¶ 17.)  The CEO did tell Plaintiff over email that his "performance was not in line with [the CEO's] expectations" regarding responding to emails, being late to meetings, and skipping meetings.  (ECF No. 34-1 ¶¶ 21-22; ECF No. 39-2 ¶¶ 21-22.)  Defendants assert that the CEO and Plaintiff also had in-person meetings where the CEO expressed Plaintiff was not meeting performance expectations.  (ECF No. 39-2 ¶ 21.)  However, Plaintiff disputes these meetings occurred.  (ECF No. 38-5 at 27:11-13 (Plaintiff testifying that "[no]body talked to [him] about [his] performance while [he] worked at Capacity"); ECF No. 34-1 ¶ 21 ("[The CEO] only testified that in or around 2022, he sent an email to Plaintiff about how Plaintiff's 'performance was not in line with [his] expectations.'").)

During his employment at Capacity, Plaintiff expressed to Human Resources (HR) that he felt he was being treated differently due to his race.  (ECF No. 38-1 ¶ 126.)  Plaintiff also expressed he was excluded from meetings, but white executives were included.  (*Id.* ¶ 127.)  Plaintiff alleges that the CEO would criticize his diction and cadence as well as his integrity and mock Plaintiff's tone and words, comments Plaintiff never observed the CEO make to white executives.  (*Id.* ¶¶ 128-132.)  Defendants deny these assertions.  (*See* ECF No. 33-1 ¶¶ 89-92.)

In October 2021, there was a sale of Capacity's stock.  Capacity repurchased the former Chief Financial Officer's (CFO) shares of stock in the company for $22,000,000.  (*Id.* ¶ 24; ECF No. 38-1 ¶ 24.)  Those shares were then sold to another entity, Mitsui & Co., for $22,000,000.  (ECF No. 33-1 ¶¶ 26-27; ECF No. 38-1 ¶¶ 26-27.)  Plaintiff alleges that he was entitled to a payout from this sale under the Agreement, which he did not receive.  (ECF No. 1 ¶¶ 10-11.)  Plaintiff testified that he believed the former CFO, who is white, received a payout from this sale.  (ECF

No. 38-5 at 20:18-21:2, 68:5-14.)  Plaintiff also testified that he believed the CEO and another executive also received a payout from this sale.  (*Id.* at 21:23-22:5, 22:10-20.)  Plaintiff alleges he learned this through a conversation with the former CFO and other employees.  (*Id.* at 20:11-21:7, 22:10-23:8.)  However, the CEO testified that no "other employees who had equity in the company benefit[ed] from this sale at all[.]"  (ECF No. 38-7 at 29:12-14.)

In 2022, Chief Experience Officer Darren Lavelle submitted a hostile work environment complaint to HR regarding Plaintiff.  (ECF No. 33-1 ¶ 72; ECF No. 38-1 ¶ 72.)  Lavelle is white.  (ECF No. 38-5 at 52:13-15, 104:9-15.)  In this complaint, Lavelle recounted that Plaintiff took a "menacing stance" and was in a "blind rage" during a conversation regarding client services.  (ECF No. 33-1 ¶ 73; ECF No. 38-1 ¶ 73.)  Other employees including Thomas Campbell, Capacity's Chief Strategy Officer, and Jocelyn Petersen, Capacity's CFO at the time, also reported alleged incidents involving Plaintiff to HR.  (ECF No. 33-1 ¶¶ 75-88.)  Campbell reported that in late 2022 or early 2023, Plaintiff "became very agitated and heated" in a conversation with Campbell and the CEO about a scheduling issue.  (ECF No. 33-1 ¶¶ 76-79; ECF No. 38-1 ¶¶ 76-79.)  Campbell also reported that during a high-stakes client meeting in 2023, Plaintiff "exited the room abruptly creating a difficult situation" due to an issue with a PowerPoint presentation.  (ECF No. 33-1 ¶¶ 80-84; ECF No. 38-1 ¶¶ 80-84.)  Peterson also made a statement about the high-stakes client meeting, recounting that Plaintiff was "triggered" and "left the conference room abruptly and clearly frustrated."  (ECF No. 33-1 ¶¶ 85-86; ECF No. 38-1 ¶¶ 85-86.)

Although Plaintiff does not dispute these employees made such reports, he does dispute the characterization of these incidents.  (ECF No. 38-1 ¶¶ 76-88.)  Regarding the high-stakes client meeting, Plaintiff testified that he did not expect to speak during that meeting and when he was asked to speak on some PowerPoint slides, "I basically said -- I was caught off guard. And I didn't

feel comfortable speaking to the slides" so another employee spoke on the topic.  (ECF No. 38-5 at 63:11-64:15.)

### 3.    *Events of June 29, 2023 and Termination*

On June 29, 2023, the CEO called a meeting regarding shipping methods.  (ECF No. 33-1 ¶ 38; ECF No. 38-1 ¶ 38.)  Plaintiff testified that the meeting was about prioritizing orders while Capacity was recovering from a cyber attack that disrupted its shipping capabilities.  (*See* ECF No. 38-5 at 34:17-22.)  The meeting included the CEO and executive team members, including Lavelle, but not Plaintiff.  (*Id.* at 34:17-22, 35:8-15, 44:22-45:6.)  Plaintiff testified that he was told about the meeting by another employee, and he went to the conference room because the meeting involved shipping methods, which related to his position as COO.  (*See id.* at 34:17-35:3.)  It is undisputed that during the meeting, Plaintiff entered the room and stated that Capacity could not change shipping methods, and what was being discussed was not feasible.  (*See* ECF No. 33-1 ¶ 39; ECF No. 38-1 ¶ 39.)  Plaintiff then left the meeting.  (ECF No. 33-1 ¶ 39; ECF No. 38-1 ¶ 39.)  The CEO subsequently ended the meeting, and the meeting attendees began to disperse.  (*See* ECF No. 38-5 at 35:16-21.)

Plaintiff returned to the meeting room after the meeting had ended.  (ECF No. 33-1 ¶ 45; ECF No. 38-1 ¶ 45.)  Plaintiff testified that he returned to speak to Lavelle and another white employee about the discussion of shipping methods because this was not the first time that week that Lavelle and the other employee had proposed a change in shipping methods without consulting Plaintiff, despite this being an operational task that was his responsibility as COO.  (*See* ECF No. 38-5 at 35:22-36:5, 39:1-11, 40:2-12; 52:13-15.)  Lavelle and three other employees were in the conference room when Plaintiff returned to the meeting.  (ECF No. 33-1 ¶ 37; ECF No. 38-1 ¶ 37.)

It is undisputed that Plaintiff expressed that he did not like Lavelle having a meeting without him, (ECF No. 33-1 ¶ 46; ECF No. 38-1 ¶ 46), and Plaintiff used profanity when speaking

7

to Lavelle, (ECF No. 33-1 ¶ 35; ECF No. 38-1 ¶ 35).  It is also undisputed that Lavelle asked Plaintiff if he was "going to get physical" and Plaintiff stated "I'm not going to hit you," to Lavelle. (ECF No. 33-1 ¶ 58; ECF No. 38-1 ¶¶ 50, 56, 58-61.)  Defendants allege that Plaintiff "acted violently" and was "physically threatening," which Plaintiff denies.  (ECF No. 33-1 ¶¶ 32-33, 37; ECF No. 38-1 ¶¶ 32-33, 37.)  Plaintiff was suspended that day.  (ECF No. 34-1 ¶ 25; ECF No. 39-2 ¶ 25.)

After he was suspended, Capacity conducted an investigation into Plaintiff's conduct.  (*See* ECF No. 33-1 ¶ 34; ECF No. 38-9 at 28:2-9; ECF No. 33-10 at 2.)  Capacity collected letters from employees regarding what transpired during the meeting.  (ECF No. 33-1 ¶ 37.)  Employees recalled Plaintiff "yelling at [Lavelle] 'what the fuck [Lavelle], why do we keep having the same conversation,'" (ECF No. 33-1 ¶ 40), and that Plaintiff "loudly sa[id] to [Lavelle] what the fuck-multiple times-I thought we had this conversation already and why would you keep getting involved in operations business," (*id.* ¶ 45).  Lavelle and another employee also stated that Plaintiff called Lavelle a "bitch."  (*Id.* ¶¶ 53, 58.)  Employees recalled Lavelle stating, "I'm not going to be spoken to like that" and trying to leave the room.  (*Id.* ¶¶ 41, 47.)  Some employees stated that Plaintiff moved "aggressively" towards Lavelle, and another employee grabbed Plaintiff or stepped between Plaintiff and Lavelle.  (*Id.* ¶¶ 42, 49-50, 52, 56-57.)  Lavelle then left the room. (*Id.* ¶¶ 43, 59.)  Lavelle told a former HR manager that he felt unsafe with Plaintiff.  (*Id.* ¶ 60.) Plaintiff acknowledges that employees made these statements, but disputes their characterization of events.  (ECF No. 38-1 ¶¶ 37-61.)

Plaintiff also spoke to HR, although he disputes the resulting document from HR summarizing that conversation.  (ECF No. 33-1 ¶ 36; ECF No. 38-5 at 79:18-24.) Plaintiff testified that HR initially refused to allow him to give a statement, but he was allowed to make one after

protesting.  (ECF No. 38-5 at 78:7-14.)  Plaintiff testified that when he re-entered the meeting room on June 29 he shouted, as did Lavelle and other employees.  (*Id.* at 41:21-25.)  He recalled saying to Lavelle "that, you know, we needed to stop these repeated attempts to have operational conversations without involving me" or "I said something along the lines of, 'I mean, what the hell, man?  We going to keep on doing this?  This is about the third or fourth time we done have a situation where there was an operational issue and you running to [the CEO] and talking to him, when we agreed that we were going to align on stuff before we did it.'"  (*Id.* at 42:6-11, 43:4-13.)  Plaintiff testified that Lavelle became flustered.  (*Id.* at 42:12-14, 43:14-20.)  He also alleges that after Lavelle and the other employees left the meeting room, "they immediately went into [the CEO's] office and started talking about me."  (*Id.* at 46:20-23.)

After the investigation, Capacity terminated Plaintiff's employment on July 20, 2023.  (ECF No. 33-1 ¶ 32; *see also* ECF No. 33-10 at 2 (termination letter).)  Defendants assert that "based on Capacity's investigation and corroborating accounts, Capacity concluded that Plaintiffs 'actions clearly violated the Company Guidelines for Appropriate Conduct.'"  (ECF No. 33-1 at ¶ 34; ECF No. 33-10 at 2.)  The termination letter states that Plaintiff was terminated "for Cause for breaches of [Plaintiff's] employment agreement and Company policy."  (ECF No. 33-10 at 2.)  The letter focused on the "incident which took place on June 29 [2023]" between Plaintiff and Lavelle, but also noted "this is not the first inappropriate interaction with members of management."  (*Id.*)  The letter also stated that "Capacity simply cannot provide an opportunity for [Plaintiff] to cure the offending conduct and the breach of Company policy and [Plaintiff's] employment agreement."  (*Id.*; *see also* ECF No. 34-1 ¶ 11; ECF No. 39-2 ¶ 11.)

Plaintiff alleges he was terminated without required written notice and opportunity to cure the basis of his termination.  (ECF No. 34-1 ¶¶ 10-11.)  Defendants contend that the CEO gave

9

Plaintiff written notice, as well as had verbal conversations with Plaintiff, about "correcting [Plaintiff's] behavior" on prior occasions. (ECF No. 39-2 ¶¶ 10-11.) Both parties agree that after he was terminated, Plaintiff did not receive severance. (ECF No. 34-1 ¶ 12; ECF No. 39-2 ¶ 12.)

### B.     Procedural History

On December 21, 2023, Plaintiff filed a Complaint alleging racial discrimination and retaliation in violation of 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination (NJLAD), breach of contract, and discrimination on the basis of race in violation of the New Jersey Equal Pay Act (NJEPA).[6] (ECF No. 1 at 5-11.) On March 25, 2024, Defendants answered the Complaint, denying Plaintiff's allegations and asserting 27 affirmative defenses, including that Plaintiff failed to state a *prima facie* case of discrimination under section 1981, NJLAD or the NJEPA and "[a]ny and all decisions, actions, and conduct taken by Defendants with respect to Plaintiff's employment were undertaken for legitimate, non-discriminatory, non-retaliatory business reasons, which Plaintiff cannot show are pretext." (ECF No. 5 at 4-11.) The parties engaged in discovery and on September 11, 2025, both parties filed Motions for Summary Judgment. (ECF Nos. 33, 34.)

## II.    LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of

---

[6]     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))). "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

## III.    DISCUSSION

### A.    Plaintiff's Racial Discrimination Claims

#### 1.    Disparate Treatment Claims

Plaintiff brings racial discrimination claims under 42 U.S.C. § 1981[7] and the NJLAD,[8] N.J. Stat. Ann. § 10.5-1 *et seq.* Both statutes prohibit employers from engaging in racial discrimination

---

[7]    Section 1981 provides a private cause of action for intentional discrimination on the basis of race or national origin by private actors. *See Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 562 (3d Cir. 2002); *Thompson v. Johnson & Johnson Mgmt. Info. Ctr.*, 725 F. Supp. 826, 827 (D.N.J. 1989)

[8]    The NJLAD provides that "[i]t shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or an employer, because of the race . . . of any individual . . . to refuse to hire or employ or to bar or to discharge . . . from employment such individual or to or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]" N.J. Stat. Ann. § 10:5-12(a). In the Complaint, Plaintiff cites to N.J. Stat. Ann.

11

against employees, and "[c]laims brought under NJLAD and § 1981 are analyzed under the same framework." *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020). Plaintiff outlines claims for intentional discrimination, also known as "disparate treatment." *Kinnard v. Comfort Inn*, Civ. No. 23-01333, 2025 WL 1882830, at *4 (W.D. Pa. July 8, 2025). "[W]hen there is only circumstantial evidence of race discrimination, the discrimination claims are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 539 (D.N.J. 2022). That framework:

> first requires that a plaintiff bringing a Title VII [or section 1981[9]] claim establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, non[-]discriminatory reason" for the adverse employment action. If the defendant does advance a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to prove that the reason is pretextual, and the real reason for the adverse action is discrimination.

*Id.* (emphasis in original) (citations omitted) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). In addition to this burden-shifting framework, "[t]o prevail, a plaintiff must initially plead and

---

§ 10:5-12(f), which prohibits discrimination in public accommodations on the basis of race. (ECF No. 1 ¶ 49.) "Significantly, the prohibition of discrimination in relation to public accommodation is functionally distinct from the ban on employment discrimination." *Turner v. Johnson*, Civ. No. 17-0541, 2024 WL 4891773, at *3 (D.N.J. Nov. 26, 2024) (quoting *Thomas v. Cnty. of Camden*, 386 N.J. Super. 582, 590 (N.J. Super. Ct. App. Div. 2006)). Because Plaintiff appears to be basing his claim for discrimination on the employer-employee relationship, this claim is more appropriately brought under N.J. Stat. Ann. § 10:5-12(a) and will be analyzed as such.

[9]     "In employment discrimination cases, these [section 1981] claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017); *see also Kant v. Seton Hall Univ.*, Civ. No. 03-6135, 2008 WL 65159, at *21 (D.N.J. Jan. 4, 2008), *aff'd,* 289 F. App'x 564 (3d Cir. 2008) ("In the Third Circuit, 'the elements of employment discrimination under Title VII are identical to the elements of a[§ ] 1981 claim.' . . . Claims raised under § 1981 are analyzed in accordance with the same *McDonnell Douglas* burden-shifting framework as those raised under Title VII.") (alterations in original) (quoting *Schurr v. Resorts Int'l Hotel, Inc.,* 196 F.3d 486, 499 (3d Cir. 1999)).

ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

The Court will therefore jointly analyze Plaintiff's section 1981 and NJLAD[10] racial discrimination claims under the *McDonnell-Douglas* framework. Defendants argue that summary judgment must be granted in their favor because Capacity terminated Plaintiff due to his violent conduct, (ECF No. 33-2 at 11-13), and "Plaintiff's claims rest on conjecture, timing, and dissatisfaction with Capacity's judgment, not on evidence of racial animus or retaliatory motive," (ECF No. 41 at 4). Defendants also contend that Plaintiff has not established that his race was the but-for cause of his termination so this claim must fail. (*See* ECF No. 33-2 at 6-14.) Plaintiff counters that he has established a *prima facie* case of discrimination and points to evidence showing the employer's reason for termination was pretextual. (ECF No. 38 at 11-13.)

### a.    Prima Facie Case of Discrimination

"The bar to establish a *prima facie* case of employment discrimination is 'low.'" *Lynn v. Bank of New York Mellon*, Civ. No. 22-4655, 2025 WL 907898, at *9 (D.N.J. Mar. 25, 2025) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. Of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006)). To establish a *prima facie* case of discrimination, a plaintiff is required to show that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

---

[10]    Like section 1981 claims, "[d]iscrimination claims under the NJLAD are assessed under the *McDonnell-Douglas* burden-shifting framework." *Whitehead v. Cnty. of Monmouth*, Civ. No. 15-5352, 2015 WL 5545552, at *2 (D.N.J. Sep. 18, 2015).

It is undisputed that Plaintiff is a member of a protected class and suffered an adverse employment action, thereby satisfying the first and third prongs of the *prima facie* case. (ECF No. 33-1 ¶¶ 1, 32; ECF No. 38-1 ¶ 1; ECF No. 34-1 ¶ 10; *see also* ECF No. 33-10 at 2 (termination letter).) *Dickerson v. State of N.J. Dep't of Hum. Servs.*, 767 F. Supp. 605, 616 (D.N.J. 1991) ("Because she is black, plaintiff is a member of a protected class."); *Wills v. CulinArt Grp.*, Civ. No. 23- 23139, 2026 WL 63508, at *4 n.7 (D.N.J. Jan. 8, 2026) ("It is axiomatic that termination constitutes an adverse employment action.") (quoting *Kamdem-Ouaffo v. Task Mgmt. Inc.*, Civ. No. 17-7506, 2018 WL 3360762, at *16 (D.N.J. July 9, 2018), *aff'd in part*, 792 F. App'x 218 (3d Cir. 2019)).

Defendants argue that Plaintiff does not fulfill the second prong—that he was qualified for the position he sought to retain—"because of his violent behavior." (ECF No. 33-2 at 7.) Defendants' argument is more appropriately analyzed under the second step of the *McDonnell Douglas* framework—that Plaintiff was terminated for a legitimate non-discriminatory reason. *See Nappi v. Holland Christian Home Ass'n*, Civ. No. 11-2832, 2015 WL 5023007, at *6 (D.N.J. Aug. 21, 2015) ("[W]hile it is appropriate to consider objective job qualifications as part of plaintiff's *prima facie* case, 'the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the *McDonnell Douglas* analysis.'") (quoting *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798-99 (3d Cir. 1990)). To demonstrate one's qualifications, a plaintiff "need only show that []he met the objective qualifications for a job, or that [his] employer 'depart[ed] from a job posting's objective criteria,' thereby 'establish[ing] different qualifications against which an employee . . . should be measured.'" *Onely v. Redner's Mkts., Inc*, 697 F. Supp. 3d 410, 421 (E.D. Pa. 2023) (citations omitted) (third and fourth alterations in original) (first citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990); then quoting

*Scheidemantle*, 470 F.3d at 540).  Objective criteria can include educational, experiential, or skill requirements.  *Id.*  Plaintiff's job description required "20+ years of leadership experience in the logistics industry," "[e]xperience working in a customer-centric, operational and complex work environment," and having an undergraduate degree.  (ECF No. 33-7 at 6-7.)  Capacity's CEO testified that Plaintiff "was an experienced operator of a warehouse campus for a company that was much bigger than Capacity" and had an engineering degree, indicating he met the objective qualifications for the job as COO.  (ECF No. 38-7 at 15:18-16:7.)  Therefore, Plaintiff satisfies the second prong of the *prima facie* case of discrimination.

The fourth prong of a *prima facie* case requires an inference of intentional discrimination. *Makky*, 541 F.3d at 214.  "A plaintiff may show circumstances giving rise to an inference of discrimination with any kind of relevant evidence, including 'comparator evidence, evidence of similar racial discrimination against other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting racial animus."  *Phillips*, 624 F. Supp. 3d at 540 (alteration in original) (quoting *McFadden v. Whole Foods Mkt. Grp., Inc.*, Civ. No. 19-1103, 2021 WL 736899, at *7 (E.D. Pa. Feb. 25, 2021)).

Plaintiff argues that the circumstances of his termination give rise to an inference of discrimination because "he was the only Black executive, was subject to racially-charged comments by the CEO, complained to HR about discriminatory and exclusionary treatment, and was excluded from meetings his white colleagues attended, and was terminated immediately after complaining about this exclusion."[11]  (ECF No. 38 at 12 (citing to ECF No. 38-1 ¶ 126).)  In support, Plaintiff relies on his deposition testimony and the deposition testimony of Capacity's

---

[11]    Defendants do not appear to challenge that these individuals were "similarly situated" to appropriately serve as comparators.  (*See generally* ECF No. 33, ECF No. 41.)

15

former HR manager.  (ECF No. 38-1 ¶ 126 (citing ECF No. 38-5 at 95:5-8 (Plaintiff testifying that he "express[ed] to [the CEO] or HR that [he] believe[d] that [he] w[as] being treated differently because of [his] race"); ECF No. 38-6 at 77:3-6 (HR manager testifying that Plaintiff "complain[ed] to [her] that he thought he was being treated differently by [the CEO] because he was black"), 40:16-18 (HR manager testifying that Plaintiff "complain[ed] to [her] about being excluded from meetings [at Capacity]").)  The former HR manager also testified that Plaintiff was treated differently than other executives.  (ECF No. 38-6 at 78:5-10 ("[The CEO] never said anything about [Plaintiff] being black.  He did treat him differently, though. He did exclude him from meetings.  He did not have a day one welcoming luncheon or -- you know, it was a very night-and-day on, you know, day one for - between [Plaintiff] and [another executive] starting at Capacity.").)  Additionally, the CEO's testimony confirms that Plaintiff was the only Black person on the executive team, (ECF No. 38-7 at 13:12-14), and the CEO had not previously fired white employees for using profanity in the workplace, (*id.* at 37:15-22 (CEO testifying he has "[n]ever fired a white employee for using profanity in the workplace" although he has "heard another employee use profanity in the workplace" and not fired them for doing so).)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has satisfied the fourth prong of a *prima facie* case and Defendants' actions give rise to an inference of intentional discrimination.[12]  *See Nappi*, 2015 WL 5023007, at *6 (finding an inference of

---

[12]     Defendants argue that "[t]o establish a right to relief under § 1981, a plaintiff must show (1) that he belongs to a racial minority; (2) 'an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in' § 1981, including the right to make and enforce contracts." *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 569 (3d Cir. 2002) (quoting *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)).  This is substantially the same as the *prima facie* case standard laid out and analyzed under *McDonnell Douglas*.  *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267-68 (3d Cir. 2010) ("'[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.'  Thus . . . the burden-shifting

discrimination where "[the p]laintiff testified that [his supervisor] told [the plaintiff] he was being fired because of his religion. This evidence, either alone or with [the plaintiff's] other testimony about the comments from his peers and supervisor, viewed in the light most favorable to [the plaintiff], clearly gives rise to an inference of discrimination.").

> b.      *Legitimate, Non-Discriminatory Reason for Adverse Employment Decision*

Because Plaintiff has made a *prima facie* case of race discrimination, the Court proceeds to the next step of the *McDonnell Douglas* framework. "At the second stage of the *McDonnell Douglas* framework, an employer defendant meets its burden by producing evidence which, taken as true, would allow a reasonable jury to conclude that there was a legitimate, non-discriminatory reason for the adverse employment decision." *Phillips*, 624 F. Supp. 3d at 543. This is a "relatively light" burden, and "at this step, 'the employer need not prove that the proffered reason actually motivated the termination decision'" because the ultimate burden of proving intentional discrimination rests with the Plaintiff. *Id.* (quoting *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 657 (E.D. Pa. 2018)).

Defendants have met their burden of proffering a legitimate, non-discriminatory reason for terminating Plaintiff—Plaintiff's June 29, 2023, confrontation with Lavelle in the workplace. (*See* ECF No. 33-2 at 7-10.) Defendants point to evidence including Plaintiff's termination letter, which

---

framework introduced by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), may be used to determine whether an employer has discriminated against a plaintiff in violation of § 1981.") (citations omitted) (quoting *Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181-82 (3d Cir. 2009)); *Preston v. S. E. Pa. Transp. Auth.*, Civ. No. 20-4194, 2021 WL 4318052, at *2 (E.D. Pa. Sep. 22, 2021) ("To prove discrimination under Title VII, the PHRA, and § 1981 a plaintiff must show that they: (1) are a member of a protected class; (2) satisfactorily performed their required duties; (3) suffered an adverse employment action; and (4) the adverse employment action occurred 'under circumstances that raise an inference of discriminatory action.'") (quoting *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219-20 (3d Cir. 2014)).

17

stated Capacity terminated Plaintiff "for Cause for breaches of [his] employment agreement and Company policy" specifically related to "an incident which took place on June 29 at the Company's office. During and after a meeting, you engaged in physically threatening behavior and conduct toward Darren Lavelle."  (ECF No. 33-10 at 2.)

Defendants provide statements from employees detailing Plaintiff's behavior at the meeting.  (ECF No. 33-13 at 2 (employee email from June 30, 2023, stating that "[Plaintiff] yell[ed] at [Lavelle] 'what the fuck [Lavelle], why do we keep having the same conversation.' [Lavelle] then proceeded to try and leave the room, stating 'I'm not going to be spoken to like that', and at that moment [Plaintiff] moved aggressively towards [Lavelle]"); ECF No. 33-14 at 2 (employee email from July 5, 2023, stating "[Plaintiff] said sit your ass down and have a conversation with me like a man . . . I said to [Lavelle] no one is going to get [physical] with no one and almost momentarily [Plaintiff] yelled just be a man again and have a conversation with me- no one is going to put their hands on you"); ECF No. 33-15 at 2 (email from Lavelle on June 29, 2023, stating that "[h]ad [another employee] not physically prevented [Plaintiff] from assaulting me, I am certain I would have endured bodily harm"); ECF No. 33-17 at 2 (email from employee on July 5, 2023, stating that "[Plaintiff] walked out pointing at [Lavelle] and saying 'this fucking guy' . . . [t]here was a number of verbal remarks from [Plaintiff] towards [Lavelle], including calling him a 'bitch'").)  Defendants also point to the testimony of a former HR manager and the Chief Strategy Officer, both of whom testified that Plaintiff was terminated because of his actions during the June 29, 2023, meeting.  (ECF No. 33-16 at 57:21-23 ("So for what the incident was, which was [Plaintiff's] aggression towards another employee, that, to me, was -- yes, that was a justified terminable offense."); ECF No. 33-18 at 17:16-21 ("We didn't have a choice, except to terminate [Plaintiff] given our concerns for the safety of our colleagues based on one main

18

incident and other incidents in which [Plaintiff] had shown a volcanic personality that led people to believe that he was going to escalate to violence.").) As such, this reason suffices as a legitimate, non-discriminatory reason for Plaintiff's termination.

### c.    *Pretext for Discrimination*

Under the *McDonnell Douglas* framework:

> To survive summary judgment once an employer proffers legitimate reasons for its action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."

*Nappi*, 2015 WL 5023007, at *7 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)). A plaintiff "need[s] to 'paint[ ] the [employer's articulated reasons] as weak, implausible, contradictory, or incoherent' or show the jury that 'the employer treated other, similarly situated persons not of [their] protected class more favorably.'" *Robinson v. Giant Eagle*, Civ. No. 23-1804, 2024 WL 747237, at *2 (3d Cir. Feb. 23, 2024) (second, third and fourth alterations in original) (quoting *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022)).

Plaintiff argues that "Defendants' sole proffered reason for termination—Plaintiff's allegedly 'violent conduct'—is riddled with inconsistencies that a jury could find to be pretextual." (ECF No. 38 at 12.) He points to conflicting testimony from employees about whether Plaintiff was violent during the June 29, 2023, incident and represents that Defendants have "shifted their justification for terminating Plaintiff," by saying the June 29 incident was the "last straw" when Plaintiff was never provided notice or the opportunity to cure any alleged prior instances of misconduct. (*Id.* at 13.)

The Court finds that a reasonable juror could find that Defendants' reason for Plaintiff's termination—his "physically threatening behavior and conduct toward Darren Lavelle" on June

19

29 (ECF No. 33-10 at 2)—was pretextual.  *See, e.g.*, *Phillips*, 624 F. Supp. 2d at 543-45 (denying summary judgment because evidence created genuine dispute of material fact regarding whether defendant's proffered reason for plaintiff's termination—poor performance—was pretextual, and defendant only provided "meager" documentary evidence and "[a]n employer's lack of documentation about the plaintiff's poor performance is evidence of pretext"); *Nappi*, 2015 WL 5023007, at *7-8 (denying summary judgment where plaintiff's testimony created a dispute of material fact regarding whether defendant's reason for termination was pretextual, emphasizing that while jurors "may find [p]laintiff's version of events not to be credible, credibility assessments are the province of the factfinder").

While the June 29 incident did not result in a physical altercation, Defendants have submitted evidence regarding Plaintiff's conduct—moving aggressively toward Lavelle and his use of inappropriate language—from which a reasonable juror could find Plaintiff's termination was warranted.  (ECF No. 33-13 at 2 (employee statement on June 30, 2023, recounting that "[Plaintiff] yelling at [Lavelle] 'what the fuck [Lavelle], why do we keep having the same conversation'" and "[Plaintiff] moved aggressively towards [Lavelle]"); ECF No. 33-14 at 2 (employee statement from July 5, 2023, stating that "I stepped to the side to let [Lavelle] walk past me and found myself in between [Lavelle and Plaintiff] who was still yelling talk to me"); ECF No. 33-15 at 2 (statement from Lavelle on June 29, 2023, stating that "[h]ad [another employee] not physically prevented [Plaintiff] from assaulting me, I am certain I would have endured bodily harm."); ECF No. 33-17 at 2 (statement from employee on July 5, 2023, recalling that "[t]here was a number of verbal remarks from [Plaintiff] towards [Lavelle], including calling him a 'bitch[.]'").) The CEO also testified that the June 29 incident "was the culmination of a number of instances where [Plaintiff] had the opportunity to cure [his conduct]. This was the last straw, so to speak, as

far as the HR team was concerned. There was no further cure period at this point." (ECF No. 38-7 at 42:19-22.) Indeed, Plaintiff's termination letter notes that "[w]hile definitely the most serious, [the June 29 incident] is not the first inappropriate interaction with members of management." (ECF No. 33-10 at 2.)

But Plaintiff also provides evidence that he was never disciplined for any prior alleged misconduct nor was he placed on a performance improvement plan. (ECF No. 38-9 at 25:3-15, 45:12-23 (testimony from HR manager); ECF No. 38-7 at 17:18-18:1 (testimony from CEO).) The Chief Strategy Officer also testified that he had not heard Plaintiff threaten physical violence upon another employee and no employee had previously been terminated for the use of inappropriate language. (ECF No. 38-8 at 33:21-34:3.) Plaintiff's evidence that Defendants "treated other, similarly situated persons not of [his] protected class more favorably," can also demonstrate the employer's reason for termination is pretextual. *Robinson*, 2024 WL 747237, at *2 (alteration in original) (quotation marks omitted) (quoting *Canada*, 49 F.4th at 347). The CEO testified that other employees used profanity in the workplace and were not fired. (ECF No. 38-7 at 37:15-22.) Plaintiff also testified that he was excluded from executive meetings, unlike other white executives, and others spoke derogatorily about him at those meetings. (ECF No. 38-5 at 69:19-72:12, 104:20-23.) And a former HR manager testified that on more than one occasion, Plaintiff complained to her about being excluded from meetings relevant to his position as COO. (ECF No. 38-6 at 40:16-41:10.) This evidence creates a factual dispute as to whether Defendants' legitimate, non-discriminatory reason for Plaintiff's termination was pretextual. *See Nappi*, 2015 WL 5023007, at *7 (*See also* ECF No. 33-10 (termination letter).) Given this factual dispute, summary judgment on this claim is improper.

d.      *But-For Causation*

Defendants are also correct that to prevail on his discrimination claim, Plaintiff must ultimately prove that his race is the but-for cause of his termination.  (ECF No. 33-2 at 6.)  This requirement exists in addition to the *McDonnell Douglas* burden-shifting framework.  *See Onely*, 697 F. Supp. 3d at 421.  But to survive summary judgment, Plaintiff need only show "that [his] race was the '*likely reason* for the adverse [employment] action.'"  *Id.* (emphasis in original) (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017).  The question before the Court "is not whether the decision to terminate [employees] was 'wise, shrewd, prudent, or competent.' It is whether the evidence would allow a reasonable jury to 'disbelieve [defendant's] articulated legitimate reasons' or 'believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of [defendant's] actions.'"  *Robinson*, 2024 WL 747237, at *3 (first quoting *Fuentes*, 32 F.3d at 765; then quoting *Canada*, 49 F.4th at 349).  Drawing all inferences in Plaintiff's favor, the evidence shows that there is a genuine dispute of material fact regarding Defendants' stated reason for terminating Plaintiff and whether Defendants treated Plaintiff differently due to his race.  At this stage, Plaintiff has met his burden to show that a reasonable juror could find that Plaintiff's race was the likely reason for his termination.  As a result, summary judgment on Plaintiff's racial discrimination claims under section 1981 and the NJLAD is improper, and Defendants' Motion shall be denied as to these claims.

## 2.      *Hostile Work Environment Claims*

Plaintiff also alleges that "Defendants discriminated against Plaintiff on the basis of his minority race and color in violation of [s]ection 1981 by denying him the same terms and conditions of employment available to other employees, including but not limited to by subjecting

22

him to a hostile work environment[.]"[13] (ECF No. 1 ¶ 34; *see also id.* ¶ 51 (also asserting a hostile workplace under NJLAD).)   While "[c]laims of disparate treatment and racially hostile work environment both allege unlawful discrimination, [they] are substantially different causes of action[.]" *Jean-Louis v. RGIS Inventory Specialists, LLC*, Civ. No. 08-2662, 2011 WL 3678532, at *10 (E.D. Pa. Aug. 22, 2011).   Disparate treatment claims require "'a plaintiff to prove an adverse employment consequence and discriminatory intent by his employer,' while a 'hostile environment claim require[s] the plaintiff to show that his work environment was so pervaded by racial harassment as to alter the terms and conditions of his employment.'" *Id.* (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 768 (1998)).

Defendants argue that summary judgment should be granted on these claims because Plaintiff has provided no proof of racial discrimination by Capacity and has not shown that he experienced severe or pervasive harassment.  (ECF No. 33-2 at 13-14; ECF No. 41 at 6.)  Plaintiff responds that "[a]s the only Black person on the executive team, Plaintiff was subjected to a hostile environment" including derogatory remarks from the CEO and exclusion from executive meetings that white executives attended.  (ECF No. 38 at 7.)

A hostile work environment claim has five elements.  Plaintiff must show that "'1) the employee suffered intentional discrimination because of his/her [protected status], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.'" *Onely*, 697 F. Supp. 3d at 427 (quoting *Castleberry v. STI Grp.*, 863 F.3d 259 (3d Cir. 2017)) (emphasis in original).  A plaintiff alleging a hostile work

---

[13]    Hostile work environment claims are evaluated the same whether made under section 1981 or NJLAD.  *Dunston v. Boardwalk 1000, LLC*, Civ. No. 19-512, 2020 WL 4208116, at *4 n.37 (D.N.J. July 22, 2020).  As such, the Court will analyze these claims together.

environment due to race discrimination "must show that the alleged conduct would not have occurred but for the employee's race or national origin, and that the conduct is so 'severe or pervasive' that a reasonable person in that situation would believe that the 'conditions of employment are altered and the working environment is hostile or abusive.'" *Ali*, 957 F.3d at 181 (quoting *Taylor v. Metzger*, 706 A.2d 685, 688-89 (N.J. 1998)). In determining whether a work environment is hostile, "a court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Bennett v. Se. Pa. Transp. Auth.*, Civ. No. 24-1376, 2025 WL 1248815, at *3 (3d Cir. Apr. 30, 2025) (quotations omitted) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). A hostile work environment claim does not arise from the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere '[d]iscourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment."[14] *Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)) (alterations in original). The standard for hostile work environment claims is "notably high." *Gates v. Aramark Campus, LLC*, Civ. No. 21-1081, 2022 WL 245303, at *9 (E.D. Pa. Jan. 24, 2022) (granting summary judgment for the defendant on plaintiff's hostile work environment claim because "although [the plaintiff] may have found her time assigned to the [worksite] to be extraordinarily unpleasant, I cannot conclude that it is sufficient to meet the demanding standard for a hostile work environment claim").

---

[14]    While this case considered a hostile work environment claim under Title VII, "[t]he standard for a hostile work environment claim under § 1981 is the same as under Title VII." *Williams v. Mercy Health Sys.*, 866 F. Supp. 2d 490, 501 (E.D. Pa. 2012).

Defendants repeatedly state that Capacity never received complaints of race discrimination from any employees. (ECF No. 33-2 at 10-11, 13; ECF No. 41 at 8.) This is not dispositive. "This Court is well aware that racial discrimination need not be overt to create a hostile environment." *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 179 (3d Cir. 2016). However, viewing the facts in the light most favorable to Plaintiff, the Court nevertheless concludes that Plaintiff has not presented sufficient evidence to demonstrate that the alleged discrimination was severe or pervasive to survive summary judgment.

Plaintiff alleges that the CEO would "criticize his diction and cadence" and his integrity and did not make these remarks to white employees. (ECF No. 38-1 ¶¶ 128-132.) Plaintiff also alleges that "he was excluded from multiple board meetings where the other C-suite executive[s] were included[.]" (*Id.* ¶¶ 126-127.) However, there is no evidence in the record regarding the frequency of these alleged remarks or the number of meetings from which Plaintiff was excluded for a reasonable juror to conclude these incidents were severe or pervasive. Further, "the Supreme Court has cautioned that 'offhanded comments and isolated incidents' will not be 'considered severe or pervasive enough to constitute a hostile work environment.'" *Styer v. Frito-Lay, Inc.*, Civ. No. 13-833, 2016 WL 406715, at *15 (M.D. Pa. Jan. 11, 2016), *report and recommendation adopted,* Civ. No. 13-833, 2016 WL 393696 (M.D. Pa. Feb. 2, 2016) (quoting *Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005)); *see also Ali*, 957 F.3d at 181 ("Utterances that are merely offensive do not rise to the level of unreasonably interfering with an employee's job performance."). These alleged comments and exclusions, while offensive, do not rise to the level of severity or pervasiveness to alter Plaintiff's working conditions as is necessary for a hostile work environment claim. *See Hanzer v. Mentor Network*, 610 F. App'x 121, 126 (3d Cir. 2015) (affirming summary judgment on hostile work environment claim for defendant where "[the

25

plaintiff] alleged she was mocked because of her accent but could only pinpoint one occasion where such mocking occurred. . . . Even assuming that [the plaintiff's] allegations are true, we agree with the [d]istrict [c]ourt that one derogatory comment, along with changes in [the plaintiff's] work responsibilities, is insufficient to constitute the pervasive behavior required to sustain a hostile work environment claim"). While Plaintiff has provided evidence indicating a challenging work environment, this evidence does not satisfy the "demanding" standard for a hostile work environment claim. *Gates*, 2022 WL 245303, at *8 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *see also Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315, 334-35 (D. Del. 2019) (holding that "the circumstances identified by [the plaintiff] establish that she had an unpleasant relationship with her coworkers, and that her coworkers resented her," but the incidents cited were not sufficiently severe or pervasive to sustain a claim for a hostile work environment); *Davis v. Solid Waste Servs., Inc.*, 625 F. App'x 104, 107 (3d Cir. 2015) (holding that while the plaintiff provided evidence of "unsafe working conditions, unfair disciplinary decisions, and an unprofessional boss" the evidence did not demonstrate severe or pervasive discrimination and plaintiff's hostile work environment claim could not survive summary judgment).

Plaintiff's evidence that these comments and exclusions were severe or pervasive as to alter the conditions of his employment consists of his own deposition testimony, along with that of a former HR manager. Plaintiff's evidence that the CEO made comments criticizing his diction, cadence, and integrity consists primarily of his own testimony (ECF No. 38-1 ¶¶ 128, 132; ECF No. 38-5 at 71:24-72:12, 73:3-11), which alone is insufficient to establish that this conduct was severe or pervasive. *See Styer*, 2016 WL 406715, at *15 ("The evidence is nowhere near sufficient to show a hostile work environment based upon the plaintiff's own testimony alone."). The former

HR manager did testify that when talking about Plaintiff, the CEO would "constantly say how slow he is because he comes from Indiana.  He talks slow.  He moves slow."  (ECF No. 38-6 at 32:4-8.)  However, neither the Plaintiff's nor the former HR manager's testimony offers specifics as to the frequency, dates, or context of these comments beyond the general assertion that the CEO made comments "at [executive leadership team] meetings at different times . . . [and] at our executive offsites" (ECF No. 38-5 at 73:12-13 (Plaintiff's testimony)) and "numerous occasions in [] HR meetings," (ECF No. 38-6 at 33:23-34:1 (HR manager's testimony)).  Although these comments may be offensive, Plaintiff has not provided sufficient evidence that they rise to the level of severity or pervasiveness required for a hostile work environment claim.  *See, e.g.*, *De Piero v. Pennsylvania State Univ.*, 769 F. Supp. 3d 329, 350 (E.D. Pa. 2025) (quoting *Faragher,* 524 U.S. at 787) (second and third alteration in original) (internal quotations omitted) ("'[A] lack of racial sensitivity does not, alone, amount to actionable harassment,' and the '[m]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter [the] terms and conditions of employment to violate Title VII.'"); *Harrison-Harper v. Nike, Inc.*, Civ. No. 16-4645, 2018 WL 4614158, at *7 (E.D. Pa. Sept. 24, 2018), *aff'd,* 788 F. App'x 846 (3d Cir. 2019) (granting summary judgment for defendant because the alleged discriminatory conduct was not severe or pervasive, "[w]hile the [offensive and inappropriate] comments were made 'more than a handful of times,' there is no evidence that they were made on a daily or even weekly basis").

Plaintiff's claim that he was excluded from meetings suffers from the same deficiency. While the former HR manager confirmed Plaintiff was excluded from multiple meetings, her testimony provides little detail in terms of the frequency or specifics of such incidents, testifying only that the exclusion "happened on more than one occasion" over Plaintiff's nearly two-year

term of employment.  (ECF No. 38-6 at 41:3-10.)  In addition to the meeting that prompted the incident on June 29, Plaintiff only generally testifies that "there were other portions of [executive leadership team] meetings [he] was excluded from" and "there were board meetings where the CFO was included, and [he] was excluded[.]"  (ECF No. 38-5 at 69:19-70:2.)  These general and vague assertions are insufficient to establish the severity or pervasiveness that is required to assert a hostile work environment claim.  A plaintiff "may not rely merely on vague statements to defeat summary judgment. . . . the [d]istrict [c]ourt properly excluded [the plaintiff's] general, unsubstantiated allegations that the alleged conduct occurred regularly or all the time." *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (internal quotations omitted) (citations omitted).

Moreover, the evidence does not indicate that Plaintiff's exclusions from meetings were related to Plaintiff's race.  (ECF No. 38-6 at 40:16-41:2 (HR manager testifying that Plaintiff "would tell [the HR manager] that . . . there are things that [Plaintiff] felt he should have been in the loop of, at the forefront of, as a chief – as the COO of the company"); *id.* at 78:5-16 (HR manager testifying that the CEO did treat Plaintiff differently and exclude him from meetings but that the "[CEO] never said anything about [Plaintiff] being black").  Further, the former HR manager testified that Plaintiff and the CEO "bumped heads a lot," which she attributed to their different management styles (*id.* at 41:19-22, 43:14-23); she testified that "[p]eople are being included in some meetings; you're being excluded from others.  I can completely empathize with why [Plaintiff] felt he was being singled out, why [Plaintiff] felt left out.  But can I say that it was based on him being black? No, I can't," (*id.* 78:21-25).

While the evidence is sufficient to survive summary judgment on Plaintiff's disparate treatment claim, *see supra* Section III.A.1, it does not rise to the level of establishing severe or

pervasive discrimination to satisfy the demanding standard of a hostile work environment claim. *See, e.g.*, *Gillis v. Norristown State Hosp.*, Civ. No. 22-3362, 2023 WL 3455614, at *5-7 (E.D. Pa. May 15, 2023) (finding on a motion to dismiss that plaintiff stated a claim for discrimination under a disparate treatment theory, but not a hostile work environment theory); *Gates*, 2022 WL 245303, at *8, *9 (denying summary judgment on plaintiff's disparate treatment claim, but granting summary judgment for the defendant on plaintiff's hostile work environment claim because the plaintiff did not meet the "demanding standard for a hostile work environment claim"). For example, in *Onely v. Redner's Markets, Inc.*, the court held that the plaintiff's race discrimination hostile work environment claim survived summary judgment because a rational jury could conclude, from the evidence provided, that the discrimination alleged was pervasive. 697 F. Supp. 3d at 430. The record included specific evidence of frequent and threatening racially-based comments made throughout plaintiff's time employed by the defendant, such as an employee giving plaintiff a nickname that was "a reference to a Black drug dealer from a movie," another employee "subject[ing the plaintiff] to a barrage of comments that indicated that [the employee] viewed her Black colleagues with contempt and viewed Black people as inferior," and during an argument that same employee acting threateningly towards the plaintiff by "curs[ing] . . . throwing a pan that she was cleaning into the sink in anger and exiting the building." *Id.* at 428-29. However, the plaintiff's hostile work environment claims based on sex and disability discrimination did not survive summary judgment because the substantiated evidence of discriminatory comments or incidents could not "clear the high bar for severe or pervasive [] discrimination[.]" *Id.* at 430-31. Here, Plaintiff's general and vague allegations do not satisfy this high standard. As such, the Court grants summary judgment for Defendants on Plaintiff's section 1981 and NJLAD claims for a hostile work environment.

29

## B.    Plaintiff's Retaliation Claims

Plaintiff brings parallel claims alleging retaliation under section 1981[15] and the NJLAD.[16] (ECF No. 1 at 6-7, 8-9.)  Plaintiff specifically alleges that "Defendants' termination of Plaintiff was done in intentional retaliation against Plaintiff's complaints of harassment and a hostile-work environment based on his minority race, which violated [s]ection 1981."  (ECF No. 1 ¶¶ 39, 43; *see also id.* ¶ 59 (alleging the same under NJLAD).)  Defendants argue that summary judgment should be granted on Plaintiff's retaliation claims because Plaintiff did not engage in a protected activity and "in the absence of a protected activity, there can be no causal link between such activity and any alleged adverse employment action".  (ECF No. 33-2 at 14.)

"[Retaliation] [c]laims under 42 U.S.C. § 1981 [and NJLAD] are generally evaluated under the *McDonnell–Douglas* burden-shifting framework[.]"    *Gist v. Burlington Coat Factory Warehouse Corp.*, Civ. No. 13-1094, 2014 WL 4105015, at *4 (D.N.J. Aug. 19, 2014) (quotations omitted) (quoting *Moto v. Wal-Mart Stores E., LP*, 565 F. App'x 160, 163 (3d Cir. 2014).  As such, the Court will analyze Plaintiff's retaliation claims under section 1981 and NJLAD together.  "To

---

[15]    Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]"  42 U.S.C. § 1981(a).  While the statute itself does not mention retaliation explicitly, the Supreme Court has held that "42 U.S.C. § 1981 encompasses claims of retaliation," including employment-related claims of retaliation.  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454-55, 457 (2008).

[16]    The NJLAD provides that "It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has sought legal advice regarding rights under this act, shared relevant information with legal counsel, shared information with a governmental entity, or filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."  N.J. Stat. Ann. § 10:5-12(d).

30

establish a *prima facie* case of retaliation, a plaintiff must show that: (1) []he engaged in protected activity; (2) []he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Phillips*, 624 F. Supp. 3d at 546. "[A]fter a plaintiff establishes a *prima facie* case of retaliation, 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* There is no dispute that Plaintiff was terminated, and termination is an adverse employment action. *Id.*; *Wills*, 2026 WL 63508, at *4. As such, the Court proceeds to evaluate the other elements of a *prima facie* case.

### 1.    *Whether Plaintiff Engaged in a Protected Activity*

Defendants argue that Plaintiff has failed to establish his *prima facie* case of retaliation because he never engaged in protected activity. (ECF No. 33-2 at 14 (arguing Plaintiff did not "lodge[] a formal complaint regarding racial harassment or a hostile work environment[.]")

"Protected activity occurs when an employee opposes, or participates in a proceeding against, an employer's unlawful activity[.]" *Lynn*, 2025 WL 907898, at *16 (citations omitted). However, a plaintiff need not file a formal complaint to engage in such activity. In the Title VII context,[17] this District has explained that:

> "[T]he opposition clause does not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct.'" Examples of protected opposition clause activities may include "formal letters of complaint to an employer and the EEOC as well as informal protests of discriminatory employment practices." The Third Circuit engages in a "case-specific inquiry . . . to determine whether conduct rises to the level of 'opposition' under Title VII." In conducting the inquiry,

---

[17]    "The same legal standards apply to retaliation and hostile work environment claims under Title VII, Section 1981, and NJLAD." *Cuevas v. Camden Iron & Metal, Inc.*, Civ. No. 23-20830, 2025 WL 2490544, at *5 (D.N.J. Aug. 29, 2025).

> courts "should analyze the message conveyed and not the medium of conveyance."

*Wilson v. New Jersey*, Civ. No. 16-7915, 2019 WL 5485395, at *6 (D.N.J. Oct. 25, 2019) (citation omitted) (quoting *Washco v. Fed. Express Corp.*, 402 F. Supp. 2d 547, 555 (E.D. Pa. 2005)). Informal protests, such as complaining to management, are protected activities. *Guyette v. AutoZone, Inc.*, Civ. No. 22-01472, 2024 WL 4351446, at *12 (M.D. Pa. Sep. 30, 2024); *see also Greco v. T-Mobile, USA*, Civ. No. 09-967, 2010 WL 4981264, at *12 (D.N.J. Dec. 1, 2010) ("[T]he Third Circuit has held that a 'statement complaining about [a] fellow employee's specific comments and made to that employee's supervisor in front of that employee, constitutes protected conduct.'") (quoting *Hood v. Pfizer,* 322 F. App'x 124, 130 (3d Cir. 2009)).

Although formal complaints are not necessary, "'to constitute protected activity, the opposition, complaint or protest, whether formal or informal, must clearly indicate a belief that an act forbidden by the NJLAD [or section 1981] has occurred.'" *Greco*, 2010 WL 4981264, at *12 (quoting *Hood v. Pfizer,* Civ. No. 04-3836, 2007 WL 2892687, at *19 (D.N.J. 2007), *aff'd,* 322 F. App'x 124 (3d Cir. 2009)); *see also Abney v. SEPTA*, Civ. No. 22-1351, 2023 WL 6878745, at *3 (3d Cir. Oct. 18, 2023) (analyzing retaliation claim under Title VII and holding that "[b]ecause [plaintiff's] complaints did not attribute his allegedly unfair treatment to discrimination on any protected ground, the District Court properly granted summary judgment"); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (analyzing retaliation claim under the ADEA[18] and holding that although the plaintiff's complaint made it clear "that he felt that he had been treated unfairly," the complaint "[did] not explicitly or implicitly allege that age was the reason for the alleged

---

[18]     "The retaliation analysis is the same under the ADEA, NJLAD, and § 1981." *Hooker v. Novo Nordisk, Inc.*, Civ. No. 16-4562, 2020 WL 526165, at *7 n.4 (D.N.J. Jan. 31, 2020), *aff'd,* No. 20-1427, 2021 WL 3087786 (3d Cir. July 22, 2021).

unfairness" and as such, "[a] general complaint of unfair treatment does not translate into a charge of illegal *age* discrimination")

Here, it is unclear from Plaintiff's Complaint what protected activity Plaintiff is alleging. Plaintiff generally asserts that he "complained of racial discrimination and harassment in the workplace." (ECF No. 1 ¶ 39, *id.* ¶ 59 (same).)  In his opposition brief, Plaintiff also states he was terminated shortly after a "confront[ation] with white executives about his exclusion from meetings," but elsewhere refers to "complain[ing] to HR about discriminatory and exclusionary treatment." (ECF No. 38 at 12, 13.)  Because Plaintiff states his termination occurred shortly after this "confront[ation] with white executives," the Court will infer Plaintiff is referring to the confrontation during the June 29 meeting, as well as prior complaints to HR.  (*See id.*)

The Court has not been presented with evidence that Plaintiff engaged in a protected activity with respect to his conduct during the June 29 meeting.  Even though Plaintiff was not required to file a formal complaint, the Court does not find that Plaintiff's statements during the June 29 meeting constitute protected activity to assert a retaliation claim.  (*See, e.g.*, ECF No. 33-1 ¶ 40 (employee recalling that Plaintiff "yell[ed] at [Lavelle] 'what the fuck [Lavelle], why do we keep having the same conversation'"); *id.* ¶ 45 (employee recalling that Plaintiff "loudly sa[id] to [Lavelle] what the fuck-multiple times-I thought we had this conversation already and why would you keep getting involved in operations business"); ECF No. 38-5 at 43:4-8 (Plaintiff testifying that he used profanity and "said something along the lines of, 'I mean, what the hell, man? We going to keep on doing this?'").)  There does not appear to be any evidence in the record that Plaintiff expressed that he believed his exclusion from the June 29 meeting was discriminatory. Instead, Plaintiff's statements focus on how his exclusion from the meeting impacted his ability to manage the operations of the company as COO, not the discriminatory nature of the exclusion.

33

When a complaint does not specifically identify and oppose an unlawful practice, it cannot constitute "protected activity" to make out a *prima facie* case for retaliation. *See Greco*, 2010 WL 4981264, at *12; *Abney*, 2023 WL 6878745, at *3; *Barber*, 68 F.3d at 702.

However, the Court finds that Plaintiff did engage in protected activity outside of the June 29 meeting. There is evidence in the record indicating that Plaintiff complained of race discrimination to a former HR manager, and he testified that he also complained to the CEO. (ECF No. 38-6 at 77:3-6 (former HR manager testifying that Plaintiff complained "that he thought he was being treated differently by [the CEO] because [Plaintiff] was black"); ECF No. 38-5 at 95:5-8 (Plaintiff testifying that he "express[ed] to [the CEO] or HR that [he] believe[d] that [he was] being treated differently because of [his] race").) These complaints, while seemingly informal, are protected activity. *See Onely*, 697 F. Supp. 3d at 425 ("[W]hen an employee communicates *to [his] employer* a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity.") (emphasis in original) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)).

### 2.    *Whether There was a Causal Connection Between Plaintiff's Protected Activity and Termination*

Because there is evidence that Plaintiff engaged in some protected activity, to establish a *prima facie* case of retaliation Plaintiff must also show that "there was a causal connection between the protected activity and the adverse action." *Phillips*, 624 F. Supp. 3d at 546. Plaintiff "'must produce evidence sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action.' The 'temporal proximity' between the protected activity and adverse employment action can be 'unusually suggestive' evidence of causation." *Onely*, 697 F.

34

Supp. 3d at 426 (internal quotations omitted) (first quoting *Carvalho-Grevious*, 851 F.3d at 258-59; then quoting *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017)).

Plaintiff cannot make this connection. The record is unclear on the timing of Plaintiff's complaints to HR or how many were made, making it difficult to evaluate any causal link. One complaint involves the hiring of a new white CFO, and the HR manager testified that Plaintiff complained to her that the new CFO was treated and welcomed to the team much differently than Plaintiff. (ECF No. 38-6 at 77:7-78:14.) But Plaintiff was hired in May 2021 (ECF No. 33-1 ¶ 4; ECF No. 34-1 ¶ 1), and this complaint was made "a couple months later," (ECF No. 38-6 at 77:17-22). Plaintiff was not terminated until July 2023. (ECF No. 33-1 ¶ 32; *see also* ECF No. 33-10 at 1 (termination letter).) This temporal gap cannot lead to an inference that Plaintiff's protected activity was the likely reason for his termination. *Onely*, 697 F. Supp. 3d at 426-27 (finding no inference of a causal connection where "Plaintiff complained about [Defendant's] behavior in March 2019. Defendant fired her in October 2020, over a year and a half later. Far smaller gaps between the protected activity and adverse employment action cause the inference to 'dissipate.'"). Aside from this one complaint, there is no evidence regarding when the other complaints occurred to establish "temporal proximity" for an inference of causation. (ECF No. 38-5 at 69:19-70:8 (Plaintiff testifying that "there were board meetings where the CFO was included, and I was excluded" but including no further detail); ECF No. 38-6 at 40:16-41:10 (former HR manager testifying that Plaintiff complained to her about being excluded from meetings, but not specifying when these meetings allegedly occurred).)

Because Plaintiff cannot make out a *prima facie* case of retaliation, it is unnecessary to proceed to analyze the other steps of the *McDonnell Douglas* framework. Defendants are entitled to summary judgment on Plaintiff's retaliation claims under section 1981 and the NJLAD.

35

### C.    Plaintiff's Breach of Contract Claim

Both Plaintiff and Defendants move for summary judgment on this claim.  Plaintiff alleges that his Agreement with Defendants "entitled him to a yearly bonus and one-year severance pay if he were terminated for a reason other than good cause." (ECF No. 1 ¶ 66.)  Because, according to Plaintiff, Defendants terminated him for a reason other than good cause, "Defendants are in breach of the employment agreement by not having paid Plaintiff his contractually secured bonus and severance pay." (*Id.* ¶¶ 64-69; *see also* ECF No. 34-2 at 12-16.)  In his Motion, Plaintiff also argues that Defendants breached the Agreement by not adhering to the notice and cure provisions required for termination without cause.  (ECF No. 34-2 at 12-16.)

Defendants argue that summary judgment should be granted in their favor because Plaintiff materially breached the Agreement, which excused Defendants from any contractual obligations. (ECF No. 33-2 at 14-16.)  Plaintiff argues that his alleged breach does not permit Defendants to rewrite the terms of the Agreement and excuse their own breach, and it is genuinely in dispute whether Plaintiff even breached the Agreement.  (ECF No. 40 at 3-6.)  In opposing each other's Motions, Plaintiff and Defendants argue that—at minimum—there are genuine issues of material fact rendering summary judgment improper.  (ECF No. 38 at 13-17; ECF No. 39 at 6-8.)  The Court agrees that there are genuine issues of material fact and both parties' Motions must be denied.

"Under New Jersey law, a plaintiff must allege four elements to state a breach of contract claim: (1) a valid contract between the parties; (2) performance by the plaintiff; (3) lack of performance by the defendant, or breach of contract; and (4) damages." *Sandoz Inc. v. Sam's W., Inc.*, Civ. No. 25-02001, 2026 WL 194549, at *5 (D.N.J. Jan. 26, 2026).  "The interpretation of a[] . . . contract is a question of law that is properly decided by the court, unless the court determines that the contract is ambiguous, in which case the interpretation of the ambiguous term is a question of fact." *Bowersox Truck Sales & Serv., Inc. v. Harco Nat. Ins. Co.*, 209 F.3d 273, 277 (3d Cir.

36

2000) (citation omitted).  "A contract is ambiguous if its terms 'are susceptible to at least two reasonable alternative interpretations.' In determining whether an ambiguity exists, New Jersey law permits us to consider 'the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.'" *Neufeld v. Hayes*, Civ. No. 97-4672, 1998 WL 35401335, at *2 (D.N.J. Dec. 30, 1998) (first quoting *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 283 (D.N.J. 1992), *aff'd,* 993 F.2d 877 (3d Cir. 1993); then quoting *American Cyanamid v. Fermenta Animal Health Co.,* 54 F.3d 177, 181 (3d Cir.1995)).

It is undisputed that there is a contract between the parties, and the Agreement governed the terms of Plaintiff's employment and termination.  (ECF No. 34-1 ¶ 2; ECF No. 39-2 ¶ 2.) Regarding Plaintiff's obligations under the Agreement, it specifies that Plaintiff "shall perform such duties as are generally associated with the position of 'Chief Operating Officer' of a company of similar size as Capacity."  (ECF No. 33-6 at 2.)  However, the Agreement itself does not further delineate Plaintiff's duties.   On its face, the meaning of this contract term is ambiguous. Defendants assert that Plaintiff's duties included "'acting as a strategic business partner to the CEO' and providing 'inspirational leadership and strategic direction to Capacity's operations;' ensuring a 'safe and secure working environment at each facility;' and establishing and maintaining positive employee relations and excellent internal communications."[19] (ECF No. 33-2

---

[19]    As previously discussed, this description of Plaintiff's duties comes from a document labeled "Position and Candidate Specification" that was used by an executive search firm in hiring a COO.  (*See* ECF No. 33-2 at 15; ECF No. 33-7 (Position and Candidate Specification).)  New Jersey law permits terms from other documents to be incorporated into a contract, but "'[f]or there to be a proper and enforceable incorporation by reference of a separate document,' (1) the separate document 'must be described in such terms that its identity may be ascertained beyond doubt' and (2) 'the party to be bound by the terms must have had knowledge of and assented to the incorporated terms.'" *Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 600 (3d Cir. 2020) (internal quotations omitted) (quoting *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 983 A.2d 604, 617 (N.J. Super. Ct. App. Div. 2009)); *see also Rave Pak, Inc. v. Bunzl, USA Inc.*, Civ. No. 21-00295, 2021 WL 3486937, at *3 (D.N.J. Aug. 9, 2021) ("A separate document is properly

at 15.)  Plaintiff does not dispute that the "Position and Candidate Specification" identifies some of his job responsibilities "[d]uring his employment" but does not concede these were his duties *under the Agreement*.  (ECF No. 38-1 ¶ 10.)  Plaintiff does not provide as detailed a description of his duties but seems to focus solely on his responsibilities managing the operations of the business when arguing that he did not breach the Agreement.  (*See* ECF No. 34-2 at 11; ECF No. 38 at 12.)

"[W]here the meaning of a contract provision is 'uncertain or ambiguous and depends upon parol evidence admitted in aid of interpretation, the meaning of the doubtful provision should be left to the jury.'"  *Neufeld*, 1998 WL 35401335, at *3 (quoting *Garden State Buildings v. First Fidelity Bank,* 702 A.2d 1315, 1323 (N.J. Super. Ct. App. Div. 1997)); *see also Polson v. Vivimed Labs Inc. USA*, Civ. No. 20-00914, 2023 WL 3689557, at *3 (D.N.J. May 26, 2023), *aff'd,* Civ. No. 23-2121, 2024 WL 302181 (3d Cir. Jan. 26, 2024) ("If the meaning of a contract is ambiguous, summary judgment is generally not appropriate.") (quoting *Soranno v. Heartland Payment Sys., LLC*, Civ. No. 18-16218, 2020 WL 5652469, at *6 (D.N.J. Sep. 23, 2020)).  Because the scope of Plaintiff's duties under the Agreement is unclear, summary judgment on this claim is improper.  As a result, it is not necessary to proceed to evaluating the parties' arguments on whether Defendants terminated Plaintiff with or without cause and breached their obligations under the Agreement.  Both parties' Motions are denied.

---

incorporated by reference where '[1] the underlying contract makes clear reference to [the] separate document, [2] the identity of the separate document may be ascertained, and [3] incorporation of the document will not result in surprise or hardship.'") (quoting *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003)).  The "Position and Candidate Specification" is not clearly incorporated into the Agreement.  The Agreement makes no reference to the "Position and Candidate Specification," either explicitly or implicitly.  Instead, the Agreement describes Plaintiff's duties as those "generally associated" with the COO position "of a company of similar size as Capacity."  (ECF No. 33-6 at 2.)

### D.    Plaintiff's NJEPA Claim

Lastly, Plaintiff brings a claim alleging violation of the NJEPA.  Plaintiff alleges that under the Agreement he "was entitled to receive compensation from the sale of 22% of Capacity as an employment benefit with Defendants" and "Defendants failed to pay Plaintiff the compensation he was entitled to Defendants, however, paid out similarly situated Caucasian employees from the sale of Capacity."  (ECF No. 1 ¶¶ 72-73.)  Plaintiff does not allege breach of contract regarding this provision of the Agreement but instead submits that withholding this compensation was unlawful discrimination in violation of the NJEPA.  (*See id.* at 10-11.)  Defendants argue that summary judgment should be granted in their favor on this claim because there is no evidence Capacity paid Plaintiff less than white employees who performed substantially similar work.  (ECF No. 33-2 at 16-17.)  Plaintiff does not appear to respond to this argument.  (*See* ECF No. 38.)  As such, Defendants also argue that because Plaintiff failed to raise any argument in opposition to its Motion for Summary Judgment, he has waived argument and the Court should grant summary judgment in their favor.  (ECF No. 41 at 10.)

Defendants are correct that "'[a] party that fails to address an argument in its brief in opposition to a motion for summary judgment waives that argument.'"  *Kent v. Calcada*, Civ. No. 21-18396, 2024 WL 4504426, at *3 (D.N.J. Apr. 25, 2024) (quoting *Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F. Supp. 3d 513, 522 (W.D. Pa. 2021)).  "Nevertheless, [the movant] bears the initial burden on summary judgment, and the Court will not automatically grant summary judgment merely because [the non-moving party] fails to oppose [the movant's] arguments."  *Id.*

The NJEPA provides that "[i]t shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or an employer to pay any of its employees who is a member of a protected class at a rate of compensation, including benefits, which is less than the rate paid by the employer to employees who are not members of the protected class for

39

substantially similar work, when viewed as a composite of skill, effort and responsibility." N.J. Stat. Ann. § 10:5-12(t). A *prima facie* case of unequal pay discrimination requires a plaintiff to show "that 'employees [not in the protected class] were paid differently for performing "equal work"—work of substantially equal skill, effort and responsibility, under similar working conditions.'" *Eskinazi v. Corp. Subscription Mgmt. Servs., LLC*, Civ. No. 25-04879, 2026 WL 445809, at *13 (D.N.J. Feb. 17, 2026) (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000)). If an employee has made out a *prima facie* case, an employer can overcome the presumption of an unlawful employment practice by showing that the pay differential is due to a valid reason such as seniority, a merit system, or "one or more legitimate, bona fide factors . . . such as training, education or experience, or the quantity or quality of production[.]" N.J. Stat. Ann. § 10:5-12(t).

There is no dispute that Plaintiff is a member of a protected class, so the first requirement of the *prima facie* case is met. (ECF No. 33-1 ¶ 1; ECF No. 38-1 ¶ 1.) *Dickerson*, 767 F. Supp. at 616. However, the Court agrees that Plaintiff has not established that an employee who was not a member of a protected class received greater compensation than Plaintiff. Plaintiff focuses specifically on the benefit he alleges was due to him from the sale of Capacity's shares in 2021. (ECF No. 1 ¶¶ 72-73.) Plaintiff testified that he believed a former executive, who is white, received a payout from this sale.[20] (ECF No. 38-5 at 20:18-21:2, 68:5-14; ECF No. 1 ¶ 12.) However, the CEO testified that no "other employees who had equity in the company benefit[ed] from this sale at all[.]" (ECF No. 38-7 at 29:12-14.)

---

[20]    Plaintiff also testified that he believed the CEO and another current executive also received a payout from this sale. (ECF No. 38-5 at 21:23-22:5, 22:10-20.) However, in his Complaint, he only alleges that the former white CFO received a payout and Plaintiff was denied one because of his race. (ECF No. 1 ¶ 12.)

Generally, a plaintiff must offer "independent support" for their belief that they are paid less than employees outside the protected class. *Stevens v. Bryn Mawr Tr. Co.*, Civ. No. 19-2418, 2022 WL 15534889, at *12 (E.D. Pa. Oct. 27, 2022)[21] ("To make this *prima facie* showing, a plaintiff may have to offer 'independent support' for her belief of inequal pay across the sexes for equal work.") (quoting *Yan Yan v. Fox Chase Cancer Ctr.*, 627 F. App'x 66, 70 (3d Cir. 2015)). Courts have found summary judgment in a defendant's favor appropriate when the plaintiff has failed to offer independent support of their claim of unequal payment for equal work. *Id.* (granting summary judgment for the defendant when the plaintiff "fail[ed] to offer any independent support of her claim that male and female tellers were paid differently for equal work.") (collecting cases); *see also Rivera O'Bryant v. City of Reading*, Civ. No. 03-06635, 2005 WL 1971882, at *7 n.15 (E.D. Pa. Aug. 11, 2005), *aff'd sub nom. O'Bryant v. City of Reading*, 197 F. App'x 134 (3d Cir. 2006) (granting summary judgment for the defendant where the plaintiff's "mere assertion . . . of the titles and salaries of other white administrative employees, without more, is not enough to create a genuine issue of material fact" and the plaintiff presented no additional evidence about those employees' job duties, education, or experience to enable a reasonable factfinder to conclude those employees' positions were similar to her own).

Besides his own statements in the Complaint and at his deposition, Plaintiff has provided no support for his assertion that he received unequal pay compared to the former CFO despite the

---

[21]    Although this case analyzes a claim made under the federal Equal Pay Act, "'[g]enerally, courts considering [NJEPA] claims analyze such claims under the framework of the federal EPA.'" *Eskinazi*, 2026 WL 445809, at *13 (quoting *Spiewak v. Wyndham Destinations, Inc.*, Civ. A. No. 20-13643, 2023 WL 869309, at *5 (D.N.J. Jan. 26, 2023)).  The main difference between the two is simply that "[t]he [NJEPA] covers not only unequal pay claims based on gender but also unequal pay claims based on age and disability." *Id.* at *13 n.9.

two performing substantially "equal work." As such, the Court grants summary judgment in Defendants' favor on this claim.

## IV.    CONCLUSION

For the foregoing reasons, and other good cause shown, Defendants' Motion (ECF No. 33) is **GRANTED in part** and **DENIED in part** and Plaintiff's Motion (ECF No. 34) is **DENIED**. The Court grants summary judgment in favor of Defendants on Plaintiff's hostile work environment and retaliation claims under section 1981 and NJLAD and Plaintiff's NJEPA claim. The Court declines to grant summary judgment on Plaintiff's disparate treatment claims under section 1981 and NJLAD and Plaintiff's breach of contract claim. An appropriate Order follows.

Dated: March 25, 2026

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE